839 So.2d 1231 (2003)
Wilbur FLINTROY, Plaintiff-Appellee,
v.
SCOTT CUMMINS SALVAGE, Defendant-Appellant.
No. 36,857-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 10, 2003.
Rehearing Denied April 3, 2003.
*1232 Lunn, Irion, Salley, Carlisle & Gardner, by J. Martin Lattier, Shreveport, for Appellant.
E. Roland Charles, Samuel H. Thomas, Tallulah, for Appellee.
Before BROWN, CARAWAY and PEATROSS, JJ.
BROWN, C.J.
This disputed workers' compensation claim was filed after the employer discontinued *1233 benefits. The Workers' Compensation Judge ("WCJ") found in favor of the employee, Wilbur Flintroy, and against the employer, Scott Cummins Salvage ("Salvage"), reinstating benefits and awarding penalties and attorney fees. For the following reasons, we reverse that part of the judgment awarding penalties and attorney fees. In all other respects, the judgment is affirmed.

Facts
Flintroy was employed as a mechanic at Salvage in Monroe, Louisiana. On October 2, 1996, Flintroy was in the process of cutting a gasoline tank off of a truck with an acetylene torch (blowtorch), when fumes ignited and the tank exploded. He sustained serious injuries to his eyes and hands.
Salvage paid temporary total disability ("TTD") benefits from October 19, 1996, through October 18, 2000, at a weekly rate of $160.50. Flintroy's benefits were terminated in October 2000 based on a report from Dr. Marion Milstead, an orthopedic surgeon, approving a modified yard worker job. Flintroy filed this disputed claim on February 2, 2001.
The WCJ found that Dr. Milstead's opinion only pertained to Flintroy's hands. Dr. Joseph Barron, who was claimant's primary treating ophthalmologist, never gave his approval for Flintroy's return to work after an April 24, 2000, eye surgery. The WCJ found that Salvage should have made an inquiry concerning Flintroy's eyes prior to terminating his benefits.
On May 10, 2002, judgment was rendered. First, the WCJ considered evidence of Flintroy's ability to perform some type of work, but stated that the "type and extent of those activities must still be determined" and ordered the reinstatement of claimant's TTD benefits at a weekly rate of $160.50, retroactive to October 19, 2000, and continuing until claimant is released to work by Dr. Barron. Second, the WCJ appointed a vocational rehabilitation counselor to assist Flintroy's return to the workforce. Third, the WCJ ruled that the section listed under number four of the yard worker job description entitled "fine manipulation," shall be specifically addressed by Dr. Barron. Fourth, claimant's medical bills which related to his eye injuries were ordered to be paid. Finally, the WCJ awarded to claimant penalties in the amount of $2,000 and attorney fees in the amount of $8,000.
Salvage appeals, raising three assignments of error.

Discussion
Standard of Review
Factual findings in workers' compensation cases are subject to the manifest error/clearly wrong standard of review. If the factfinder's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.07/01/97), 696 So.2d 551; Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). Louisiana workers' compensation law is to be liberally construed in favor of coverage. Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989).
Reinstatement of Benefits/Vocation of Rehabilitation/Forfeiture Under La.R.S. 23:1208
Salvage claims the WCJ erred in reinstating TTD benefits, ordering additional *1234 vocational rehabilitation and failing to find that Flintroy had forfeited all benefits because of willful misrepresentations. After reviewing the evidence, we cannot say that the WCJ was clearly wrong in regard to these findings and conclusions.
Hand Injuries
Dr. Myron Bailey, an orthopedic surgeon, treated Flintroy for his hand injuries. Dr. Bailey stated that claimant's right hand had multiple displaced fractures and multiple punctate (marked with dots or tiny spots) wounds and that his left hand had sustained severe lacerations. Flintroy underwent surgery on the date of the accident, which included surgical debridement of his lacerations and manipulation of the fractures. K-wires, or cross pins, were inserted into his right hand.
In December of 1996, Dr. Bailey attempted to restore Flintroy to light duty; however, no such work was available. In September 1997, a functional capacity evaluation noted that claimant would be able to return to some form of work. Flintroy underwent physical therapy as recommended, but it had little effect. He also experienced post-traumatic arthritis.
On January 13, 1998, Flintroy underwent a second hand surgery. On August 27, 1998, Dr. Bailey cleared him to perform "modified work activities" and released him from his care. Dr. Bailey also estimated a 20% permanent physical impairment to the hand.
In July of 2000, Dr. Marion Milstead, another orthopedic surgeon, examined Flintroy's hands and had him undergo a series of tests. On September 1, 2000, Dr. Milstead noted that claimant's nerve tests were normal and observed that he had attained maximum medical improvement. Dr. Milstead did note, however, that Flintroy had significant grip strength deficit and changes typical of osteoarthritis, which he related to the gas tank explosion injury. Nonetheless, on October 13, 2000, he released claimant to perform light to medium work. Dr. Milstead opined that Flintroy's condition was permanent and approved a modified yard worker job.[1]
Eye Injuries
Flintroy was first seen by Dr. Gerald Broussard, an ophthalmologist. Dr. Broussard referred claimant to another ophthalmologist, Dr. Joseph Barron, who saw Flintroy on October 4, 1996. Both physicians observed that claimant's corneas, which are the clear front part of the eyes, were studded with minute metallic fragments from the gas tank explosion. Dr. Barron noted that claimant's right eye had corneal abrasion, but there was no penetration of the foreign metallic fragments in either eye. At that point, Dr. Barron believed that any residual deficit in vision would be mild and that these fragments would likely slough off in a few weeks.
Still experiencing eye discomfort, Flintroy again sought medical attention from *1235 Dr. Broussard. Claimant was referred to Dr. Karen Pendleton, another ophthalmologist. She performed laser surgery on March 26, 1997.[2] Dr. Pendleton opined that claimant would reach maximum medical improvement within six to nine months after the surgery; she noted that he would be ready for light duty work which would not require depth perception.[3]
However, Flintroy's right eye irritation and vision problems continued. On October 9, 1999, Dr. Barron performed a corneal transplant surgery, or a graft.[4] By November 19, 1999, claimant began to develop corneal vascularization, which signifies an increased inflammation, at the top part of where the graft had been performed. Dr. Barron removed one of the sutures at the site of the inflammation. He also noted that claimant's left eye had actually improved to 20/30 vision at that time.
On November 29, 1999, Dr. Barron opined that claimant was temporarily totally disabled and could return to work in eight to 12 weeks. Flintroy's work restrictions included no lifting of anything over 40 pounds and protective eye-wear for both eyes.
Dr. Barron observed a rejection of the October 9, 1999, graft surgery on December 3, 1999. Flintroy was still complaining of pain in his right eye. Dr. Barron saw corneal swelling and administered an injection for the inflammation at the top part of the graft. On December 17, 1999, Dr. Barron reiterated that claimant was temporarily totally disabled; he also reiterated his prior work restrictions, and increased his restriction that claimant lift nothing over 35 pounds to prevent jarring open the graft site.
On March 21, 2000, Dr. Barron approved of the job position as a salvage yard worker for Flintroy. On April 24, 2000, however, Flintroy underwent an emergency surgery for a ruptured corneal graft in his right eye. Dr. Barron performed the surgery and resutured his corneal graft. At that time, Dr. Barron restricted Flintroy from returning to work for one month and "then (Flintroy) would not be able to work out of doors for approximately three months." Dr. Barron saw claimant from April 24, 2000, through March 23, 2001. On each visit, Flintroy continued to complain of eye pain and that there was no improvement in his right eye. His corneal graft was still considered a failure as of March 23, 2001. Dr. Barron finally concluded that Flintroy had "completely lost useful vision" and had a permanent total disability in his right eye.
Term of Award for Temporary Total Benefits
At the time of Flintroy's injury, La.R.S. 23:1221(1)(d) provided:
An award of benefits based on temporary total disability shall cease when the physical condition of the employee has *1236 resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made, and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required, or six months after the injury whichever occurs first. If the claimant contends that his disability is of a temporary nature, but extends beyond this six-month period, he must submit a claim for extension of the period of temporary total disability under La.R.S. 23:1310.3.
Therefore, the initial award of TTD benefits will be for, at most, six months after the date of injury. If the employee contends that his disability is of a temporary nature, but extends beyond this six-month period, he must submit a claim for extension of the period of TTD under La.R.S. 23:1310.3. La.R.S. 23:1221(1)(d).
While it is true that La.R.S. 23:1221(1)(d) provides that the initial award can only be for six months after the date of injury, this is not the case when the parties stipulate that the disability is ongoing. Smith v. Morris, 2002 WL 31894844 (La.App. 1st Cir.12/20/02), ___ So.2d ___; Hughes v. Carroll Timber Co., 96-0031 (La.App. 1st Cir.10/01/96), 694 So.2d 331. The stipulation eliminates the burden of proving that claimant's disability extended beyond the initial six-month period. Accordingly, benefits will be awarded on an ongoing basis until it is proven that the claimant no longer suffers from a TTD. Id.
In the instant case, it was expressly stipulated by both parties that the injury occurred on October 2, 1996, within the course and scope of employment. The record does not reflect that a claim for extension of the period of TTD was filed by Flintroy. However, Salvage continued to pay TTD benefits from October 19, 1996, through October 18, 2000. Despite paying claimant benefits for four years, Salvage now urges for the first time in this appeal that it should have stopped payment on April 2, 1997.
We find this argument disingenuous. After Flintroy filed his 1008 claim on February 2, 2001, Salvage's answer disputing the claim never mentioned the six-month limit as a reason for terminating his benefits. In light of these facts and the law, we reject the argument that the initial award of TTD benefits should have ceased after a period of six months from the date of injury, or on April 2, 1997. To hold otherwise would contradict the ratio legis behind Section 1221. Furthermore, we are mindful of the jurisprudential tenet in favor of finding coverage for a workers' compensation claimant. See Daigle, supra. Such continuous payment of benefits over a four year period is tantamount to an implied stipulation to a longer period of disability. See Smith, supra; Hughes, supra.
Alternatively, Salvage is asking this court to reconsider the evidence and give less weight to the testimonies of claimant and Dr. Barron. While Drs. Bailey and Milstead cleared Flintroy to return to work, their opinion was extended only to their orthopedic specialty relating to his hand injuries. As previously stated, Dr. Barron, who treated Flintroy for the injuries he sustained to his eyes, never cleared him to return to work following the April 24, 2000, emergency surgery to his right eye. The WCJ did not reject or give less weight to any medical opinion but correctly limited the impact to the particular specialty involved.
*1237 Nevertheless, the WCJ recognized Flintroy's ability to perform some type of work but found that the type and extent must still be determined. That finding, together with recommencing vocational rehabilitation counseling, requires a consideration of the law regarding supplemental earning benefits ("SEB").
SEB were established in 1983 as a method of replacement of lost wages for partially disabled employees. The benefits are designed to replace lost earning capacity of workers who do not fall under the definition of total disability. Allen v. City of Shreveport, 618 So.2d 386 (La.1993). Entitlement to SEB is governed by La. R.S. 23:1221(3). To recover these benefits, the employee must first prove by a preponderance of the evidence that he is unable to earn wages equal to ninety percent or more of the wages he earned before the accident. La. R.S. 23:1221(3)(a). Once the employee's burden is met, the burden then shifts to the employer, who, if he wishes to defeat or reduce SEB, bears the burden of proving that the employee is physically able to perform a certain job, that the job was available to the employee, and that the job offered or available is in the employee's or employer's community or reasonable geographic region. La. R.S. 23:1221(3)(c)(i); Daugherty v. Domino's Pizza, 95-1394 (La.05/21/96), 674 So.2d 947; Joyner v. Davison Transport, Inc., 28,880 (La.App.2d Cir.01/22/97), 688 So.2d 623. The amount of SEB is then based on the difference between the average weekly wage earned by the employee prior to the accident and the employee's earning capacity after the injury. Id.
Although suffering a total disability in his right eye, Flintroy appeared to be capable of doing some type of work by the time of trial. Thus, we affirm the reinstatement of TTD benefits up to the date of trial and thereafter award supplement earning benefits (SEB). The amount to be paid for both TTD benefits and SEB is the same.
Vocational Rehabilitation Services
Salvage argues that the WCJ erred by ordering it to provide further vocational rehabilitation counseling to Flintroy. It asserts that it has fulfilled its obligation to provide vocational rehabilitation to claimant, who has been an uncooperative party to such services offered. Salvage points out that it made two modified job offerings to claimant in March of 2000 and October of 2000.
The requirements for the rehabilitation of injured employees are set forth in La. R.S. 23:1226, which states, in pertinent part:
A. When an employee has suffered an injury covered by this Chapter which precludes the employee from earning wages equal to wages earned prior to the injury, the employee shall be entitled to prompt rehabilitation services.
B. (1) The goal of rehabilitation services is to return a disabled worker to work, with a minimum of retraining, as soon as possible after an injury occurs.
While Salvage contends that Flintroy's claims of continuing disability are false, medical evidence adduced proved otherwise. Claimant has demonstrated that he is entitled to rehabilitation services, since the facts indicate that he is an employee suffering from a work-related injury which precludes him from earning wages equal to the amount earned prior to the accident. See La.R.S. 23:1226(A). The goal of rehabilitation is to return the disabled worker to gainful employment as soon as possible, with a minimum of retraining.
*1238 We agree with the WCJ's order to provide vocational rehabilitation to claimant and find that Salvage is obligated to continue in its effort to work with the vocational counselor and Flintroy's medical providers in an attempt to return him to gainful employment as soon as physically possible.
La.R.S. 23:1208
Salvage argues that Flintroy violated La.R.S. 23:1208 and has therefore forfeited his entitlement to any benefits. Salvage urges that surveillance of Flintroy established that claimant was indeed working and performing various activities, contradicting his disability claim that he was unable to perform the modified job position Salvage had offered. Salvage argues that the surveillance performed on Flintroy revealed him executing the following activities: performing manual labor with a hoe at an apartment complex; driving one of his vehicles on numerous occasions; picking up lumber at a lumber yard and walking to a trailer; driving a load of scrap metal on a flat bed trailer; placing skirting at the bottom of a trailer; and performing auto repair work underneath his truck at his residence. Salvage also notes how Dr. Barron found significant callouses on both of claimant's hands on June 1, 1998, and June 18, 1998.
Salvage further contends that prior to the October 2, 1996, accident, Flintroy "was no stranger to litigation and claim injuries." He filed a workers' compensation claim for an alleged knee injury in a Sterlington plant explosion. In 1993, Flintroy was involved in a staged automobile accident as part of an automobile insurance fraud scheme. He was indicted by a federal grand jury and pled guilty to conspiracy. Also, Flintroy admitted to filing a plethora of claims for neck and back injuries due to automobile accidents.
The judgment rendered by the WCJ does not speak to the issue of forfeiture of benefits, although the claim was made in the employer's amended answer. We can infer that the judgment's silence as to this issue is a rejection of Salvage's claim as a whole. Alexander v. Roy O. Martin Lumber Co., 00-1344 (La.App. 3rd Cir.05/09/01), 784 So.2d 872, writ denied, 01-1684 (La.09/21/01), 797 So.2d 676; Collins v. Family Dollar Stores, Inc., 99-0622 (La.App. 1st Cir.05/12/00), 760 So.2d 1210, writs denied, 00-2356, 00-2363 (La.11/13/00), 773 So.2d 727.
La.R.S. 23:1208 authorizes forfeiture of benefits upon proof that (1) there is a false statement or representation; (2) it is willfully made; and (3) it is made for the purpose of obtaining or defeating any benefit or payment. The statute applies to any false statement or misrepresentation made willfully by a claimant for the purpose of obtaining benefits. Resweber v. Haroil Construction Co., 94-2708 (La.09/05/95), 660 So.2d 7. All of these requirements must be present before a claimant can be penalized. Nolan v. Rawls Farming Co., 35,086 (La.App.2d Cir.10/31/01), 801 So.2d 524, writ denied, 02-0001 (La.03/15/02), 811 So.2d 910; Harris v. Bancroft Bag, Inc., 30,431 (La. App.2d Cir.04/09/98), 714 So.2d 44. Because this statute is penal in nature, it must be strictly construed, both in its substantive ambit and in its penalty provisions. Chevalier v. L.H. Bossier, Inc., 95-2075 (La.07/02/96), 676 So.2d 1072; Smalley v. Integrity, Inc., 31,247 (La.App.2d Cir.12/09/98), 722 So.2d 332, writ denied, 99-0072 (La.03/19/99), 739 So.2d 782.
We find no merit to Salvage's assertion that Flintroy has forfeited his right to receive benefits under La.R.S. 23:1208. The videotaped surveillance of claimant *1239 mostly showed him driving his truck and conversing with others. In fact, he kept his right eye shut and rubbed it unconsciously on several occasions. Neither the tape nor the surveillance reports ever portray Flintroy as lifting anything over 35 pounds, nor do they prove that he obtained payment of any kind in exchange for the alleged work performed. While Flintroy was convicted of conspiracy in a staged automobile accident and instituted other accident litigation, Salvage has not shown that he willfully made false representations. Certainly these incidents may test his credibility but are not proof of misrepresentation in this case. The WCJ's findings are supported by the record and are not clearly wrong.
Penalties and Attorney Fees
Recovery of penalties and attorney fees is governed by La.R.S. 23:1201.2. In Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/01/98), 721 So.2d 885, the supreme court states:
In summary, both penalties and attorney fees are now recoverable under Section 1201 F if the employer or insurer fails to commence payments of benefits timely or to pay continued installments timely (or to pay medical benefits timely) unless the claim is reasonably controverted. However, only attorney fees generally are now recoverable under Section 1201.2 if the employer or insurer arbitrarily discontinues payment of benefits due. (Emphasis added).
Alice Bond, a licensed vocational rehabilitation counselor, was retained by AIG Claim Services in January 2000 to provide vocational services. She met with claimant's physicians and discussed the modified job offers on several occasions. After claimant's emergency eye surgery, Ms. Bond met with Dr. Barron on May 26, 2000. We are cognizant that, according to Ms. Bond, Dr. Barron indicated to her that Flintroy could perform the position offered by Salvage at this meeting. Despite Ms. Bond noting that Flintroy could return to work, Dr. Barron, as Flintroy's treating ophthalmologist, never formally cleared him to return to the offered job position at Salvage after his emergency eye surgery in April 2000.
Considering these circumstances, we cannot say that Salvage arbitrarily discontinued benefits. The WCJ was clearly wrong in making such a determination.
Therefore, we reverse the award of penalties and attorney fees.
Medical Expenses
Specifically, the judgment orders "any medical services received by the claimant as related to his eye injury shall be paid for and/or reimburse(d) to claimant." (Emphasis added). The WCJ does not rule that Salvage is to pay for future medical expenses; therefore we can surmise that the judgment is only for those medical expenses already incurred by claimant for his eye injuries.
The relationship of the work-related accident to claimant's eye injuries is unquestioned. After considering the testimonies of Drs. Barron and Pendleton, claimant's surgeries, medicines, and treatments were indeed of a necessary nature. See Taylor v. Columbian Chemicals, 32,411 (La. App.2d Cir.10/27/99), 744 So.2d 704. Flintroy carried his burden of proving, by a preponderance of the evidence, the necessity and relationship of the medical expenses for his eye injuries to the October 2, 1996 work accident. Id. We are unable to find that the WCJ was clearly wrong in ordering Salvage to pay for Flintroy's *1240 medical expenses relating to his eye injuries.

Conclusion
For the foregoing reasons, we REVERSE that part of the judgment which awards penalties and attorney fees. In all other respects, the judgment is AFFIRMED except that from the date of trial, rather than temporary total disability benefits, supplemental earnings benefits are awarded. All costs of this proceeding are assigned to the employer, Scott Cummins Salvage.
REVERSED IN PART; AFFIRMED IN PART.

APPLICATION FOR REHEARING
Before BROWN, STEWART, GASKINS, CARAWAY, and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] The job description for a "salvage yard worker" who would work an eight hour day includes:

1) Unbolting and removing fuel tanks from trucks;
2) Cutting frames from diesel and gasoline engine trucks using acetylene torch;
3) Sorting salvaged parts into appropriate rows using a forklift and a bin to move parts collected.
Heavier objects are to be moved with a forklift. Objects weighing up to 20 pounds are to be sorted by hand. The forklift has one step and two safety rails for entry into its cab. An average eight hour day yard worker will enter and exit the forklift cab 20-30 times.
[2] Specifically, Flintroy underwent an "Excimer laser phototherapeutic keratectomy" to remove residual corneal metallic (iron) foreign body deposits with associated "subepithelial scarring and superficial punctate keratopathy."
[3] While Dr. Pendleton was treating Flintroy, he was under Dr. Barron's and Dr. Broussard's care concomitantly.
[4] This procedure is specifically called a "penetrating keratoplasty" and involved the removal of tissue from the cornea and then the insertion of "donor tissue" into the precise location of excision.