# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-1241

DONNA M. PHILLIPS

VERSUS

DIOCESE OF LAFAYETTE

************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 4,
PARISH OF LAFAYETTE, NO. 02-00693,
SHARON M. MORROW, WORKERS' COMPENSATION JUDGE

************

**MICHAEL G. SULLIVAN**
**JUDGE**

************

Court composed of Jimmie C. Peters, Michael G. Sullivan, and Glenn B. Gremillion, Judges.

**AFFIRMED AS AMENDED.**

Christopher R. Philipp
Attorney at Law
Post Office Box 2369
Lafayette, Louisiana   70502-2369
(337) 235-9478
Counsel for Plaintiff/Appellee:
	Donna M. Phillips

Eric J. Waltner
Allen & Gooch
Post Office Drawer 3768
Lafayette, Louisiana   70502-3768
(337) 291-1400
Counsel for Defendant/Appellant:
	Diocese of Lafayette

SULLIVAN, Judge.

In this workers' compensation case, the Diocese of Lafayette (the Diocese) appeals a judgment in favor of Donna Phillips rejecting its claim for forfeiture of benefits under La.R.S. 23:1208 and awarding Ms. Phillips penalties and attorney fees for a one-year delay in approving psychotherapy and biofeedback sessions recommended by her treating psychiatrist. Ms. Phillips has answered the appeal, seeking an additional penalty, as well as additional attorney fees for defending this appeal. We affirm and amend as follows.

### Factual and Procedural Background

Ms. Phillips was injured on October 11, 1997, as she lifted two food trays while working in a school cafeteria. She was initially treated by Dr. Stanley Foster, an orthopedic surgeon, for pain in her neck and between her shoulder blades that radiated to the left hand and lower back. A cervical MRI indicated degenerative changes at C4-5, C5-6, and C6-7 that Dr. Foster related to some of her pain, as well as a small herniation at C6-7 that caused some compression of the thecal sac, but did not require surgery at that time. In May of 1998, Dr. Foster referred Ms. Phillips to a physiatrist, Dr. Thomas Laborde, who treated her with medication and steroid injections through July of 2002 for chronic pain, diffuse tenderness, and intermittent spasm and trigger points. During the course of his treatment, Dr. Laborde referred Ms. Phillips to a psychologist, Dr. Jimmie Cole, and to a psychiatrist, Dr. Charles Bramlet.

Ms. Phillips had also been evaluated by Dr. John Cobb, an orthopedic surgeon. After reviewing the cervical MRI and a thoracic MRI that showed spondylosis from T6 through T9, Dr. Cobb recommended a cervical fusion and thoracic injections, with a possible thoracic fusion from T6 through T9, should her pain in that area become unacceptable. Dr. Thomas Montgomery, another orthopedic surgeon, did not recommend surgery, as he found no evidence of a compressive neuropathy. The

Office of Workers' Compensation (OWC) then ordered an examination by a third orthopedic surgeon, Dr. Angela Mayeux. [1] Dr. Mayeux saw no need for thoracic surgery, and she believed that the cervical procedure recommended by Dr. Cobb would have only a 50% chance of improving Ms. Phillips' symptoms.

The Diocese disputed certain aspects of Ms. Phillips' claim, which resulted in a judgment of March 16, 2001, recognizing her entitlement to supplemental earnings benefits (SEB) at a zero-earnings rate and declaring the reasonableness and medical necessity of the surgical procedure recommended by Cobb. Ms. Phillips never underwent that procedure, but she continued treatment for pain management with Dr. Laborde and Dr. Bramlet.

Dr. Bramlet first saw Ms. Phillips in January of 2001, when she reported a high level of cervical and lower back pain, which significantly limited her physical abilities, and a significant amount of depression and anxiety symptoms, including the loss of interest in pleasurable activities, crying spells, and problems with memory and concentration. Although Dr. Bramlet noted that Ms. Phillips was "a little dramatic with her presentation and detail," he concluded that she met the criteria for chronic cervical and lower back pain, with some radiculopathy and a myofascial component. He also concluded that she exhibited an "anxiety disorder . . . chronic in nature from trying to learn to deal with changes that goes [sic] along with dealing with this type of injury." To improve her chances of returning to gainful employment, Dr. Bramlet believed it was necessary to be "extremely aggressive with her treatment" and to "really manage her psychological factors." He proposed several medication changes, as well as ten individual therapy sessions and five biofeedback training sessions.

---

[1]Dr. Mayeux's report and deposition are not in the record before us, but a summary of their contents is contained in Dr. Anderson's records.

On February 5, 2001, the Diocese's managed care company denied Dr. Bramlet's request for continued psychotherapy as not "reasonable or necessary for this claimant's soft tissue injury." This denial was affirmed on February 28, 2001 and again on July 19, 2001, with the notation that "it is not reasonable to assume that a soft tissue injury could have precipitated a major psychiatric illness." In the meantime, Dr. Bramlet, who continued to see Ms. Phillips for medication management, believed that she had decompensated since her initial visit, leading him to recommend a more intensive nine-week, half-day program to deal with the worsening of her condition caused by the delay in treatment.

On September 26, 2001, Dr. James Anderson, also a psychiatrist, examined Ms. Phillips at the Diocese's request. Ms. Phillips reported that she experiences tightness in her neck that makes it hard to turn her head, aching under the shoulder blades, and pain around the mid-back and chest that "paralyzes" her. She stated that she is in pain almost every day and that if she did not take her pain medication she would be hurting all the time. Dr. Anderson noted that her MMPI-2 clinical profile, indicating neurotic tendencies, was valid. He further stated that standardized testing supported his clinical impression that a major component of Ms. Phillips' pain is related to psychological issues and functional in origin. He believed that she could benefit from continued psychiatric treatment, including biofeedback, but he considered her a poor candidate for surgical intervention to relieve her pain.

When the Diocese did not provide the requested medical treatment after receiving Dr. Anderson's report, Ms. Phillips filed this disputed claim for medical benefits, penalties, and attorney fees on January 25, 2002. A mediation conference was held on March 19, 2002, after which the Diocese agreed to approve the requested treatment, but still contested the issues of penalties and attorney fees. On May 9,

3

2002, the Diocese asserted a claim for forfeiture of benefits based upon video surveillance that allegedly "chronicles her ability to move in normal fashion and free of pain."

After a trial, the workers' compensation judge (WCJ) rejected the Diocese's forfeiture defense. Although the WCJ noted that the surveillance was "somewhat at odds with Ms. Phillips' dramatic complaints," the WCJ found that this disparity did not warrant a finding of fraud, given corroboration at trial from Ms. Phillips' neighbors and Ms. Phillips' credible explanations for her conduct. The WCJ also concluded that the severity of Ms. Phillips' complaints to her physicians was based upon unintentional exaggeration or neurotic tendencies as identified by Dr. Anderson in the MMPI-2 profile, rather than wilful misrepresentation. In awarding penalties of $2,000 and attorney fees of $5,000, the WCJ concluded that the Diocese could not rely on surveillance obtained in July of 2001 to reasonably controvert a claim for medical benefits that it initially denied in February of 2001.

### Forfeiture of Benefits

In its first assignment of error, the Diocese argues that the WCJ erred in finding that it did not meet its burden of proving that Ms. Phillips violated La.R.S. 23:1208. That statute, in part, provides:

> A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, *to willfully make a false statement or representation*.
>
> . . . .
>
> E. Any employee violating this Section shall, upon determination by workers' compensation judge, *forfeit any right to compensation benefits under this Chapter*.

(Emphasis added.)

4

In *Flintroy v. Scott Cummins Salvage*, 36,857, p. 12 (La.App. 2 Cir. 3/10/03), 839 So.2d 1231, 1238, *writ denied*, 03-1068 (La. 6/6/03), 845 So.2d 1093 (citations omitted), the court explained the application of La.R.S. 23:1208 as follows:

> La.R.S. 23:1208 authorizes forfeiture of benefits upon proof that (1) there is a false statement or representation; (2) it is willfully made; and (3) it is made for the purpose of obtaining or defeating any benefit or payment. The statute applies to any false statement or misrepresentation made willfully by a claimant for the purpose of obtaining benefits. All of these requirements must be present before a claimant can be penalized. Because this statute is penal in nature, it must be strictly construed, both in its substantive ambit and in its penalty provisions.

Concerning the standard of appellate review of a forfeiture claim, the court in *Rowan Cos., Inc. v. Powell*, 02-1894, 02-1895, p. 6 (La.App. 1 Cir. 7/2/03), 858 So.2d 676, 680, *writ denied*, 03-2177 (La. 11/14/03), 858 So.2d 425 (citations omitted), stated:

> The determination of whether there is a false statement or representation willfully made for the purpose of obtaining any benefit or payment involves inherently factual determinations and, thus, this court's review of those findings by the WCJ is governed by the manifest error standard. Under that standard of review, this court may only reverse the WCJ's decision if we find (1) there is no reasonable factual basis for the finding in the record and (2) the finding is clearly wrong or manifestly erroneous.

The Diocese contends that video surveillance of Ms. Phillips contradicts statements that she made in her deposition and to her doctors concerning her gardening activities and the severity of her complaints. In her deposition, taken in April of 2002, Ms. Phillips admitted that she "piddles" with her flowers, including "pull[ing] weeds and stuff," but she denied that she moves her window flower boxes around because, even though she can, she is "going to be hurting" or is "going to pay for it." On the surveillance tapes obtained in July of 2001, however, Ms. Phillips is shown stepping through a large window several times onto her porch, where she moved two window boxes. At trial, Ms. Phillips testified that she had forgotten about

5

that incident, explaining that she was moving the window boxes so that a neighbor could water her flowers while she was out of town.

In her deposition, Ms. Phillips described pain in her neck that restricts her ability to turn her head while driving; numbness in her hands, fingers, and feet; pain in both arms, worse on the left; and a heaviness in her legs that prevents her from walking at times. In July of 2001, about the time of the first surveillance taken, Ms. Phillips reported to Dr. Cobb that she was not improving and that the pain at times was so unbearable that she had to go to bed. During her individual therapy sessions in March of 2002, she reported to Dr. Bramlet's nurse that she was overwhelmed by her chronic pain, which interferes with doing what she wants to do. In those sessions, she was tearful at times, reporting numerous symptoms of depression, including a low energy level, lack of sleep, low self-esteem, and social isolation. The Diocese argues that these complaints are inconsistent with the activities shown on the July 2001 surveillance tape, as well as surveillance obtained in January and February of 2002. In the later videos, Ms. Phillips is seen bending forward while rolling down a vehicle's windows and while picking up something from the ground, walking up and down stairs, entering and exiting the passenger side of a vehicle, and covering the plants on her porch with a plastic bag.

The WCJ considered Ms. Phillips statement in her deposition that she had not moved her window boxes to be a "clear 'misrepresentation'" in light of the surveillance taken in July of 2001, but she found that it did not amount to fraud. "After establishing that a claimant has made a false statement or misrepresentation . . . the [WCJ] must make a factual determination as to whether, based on the record, the statement was willfully made specifically to obtain benefits, and thus defraud the workers' compensation system." *Harris v. Christus St. Patrick Hosp.*, 02-1502, p. 6

6

(La.App. 3 Cir. 10/22/03), 857 So.2d 1278, 1283, *writ denied*, 03-3193 (La. 2/13/04), __ So.2d __ (quoting *Marler v. New Orleans Area Council, Boy Scouts of Am.*, 01-1167, pp. 7-8 (La.App. 5 Cir. 3/13/02), 815 So.2d 131, 135) (second alteration in original). In the present case, the WCJ apparently accepted Ms. Phillips' explanation that she had forgotten about that occasion in July, in which she moved the window boxes so that a neighbor could water the flowers while she was out of town. We find no error in this credibility determination, given the corroboration of Ms. Phillips' explanation at trial. In the video, Ms. Phillips is seen moving the window boxes from an area that is only accessible from inside her apartment toward a common porch area, which is consistent with her explanation that she moved them so that a neighbor could water them while she was away. Jackie Cormier, who lives in the same complex as Ms. Phillips, testified that she has seen Ms. Phillips tend to her flowers through her window only once, just before Ms. Phillips left town at the beginning of August 2001. Ms. Cormier also testified that she and other neighbors have moved Ms. Phillips' large plants for her.

The WCJ next considered what she termed an "ambiguous 'misrepresentation,'" in that Ms. Phillips activities on the tapes were "somewhat at odds" with her dramatic complaints to her doctors. However, the WCJ again found that Ms. Philips' did not commit fraud, considering that Dr. Anderson reported that her MMPI-2 profile includes "neurotic" tendencies and that Ms. Phillips exhibited some movements on the tapes that were "consistent with pain, age or deconditioning[.]" Again, we find no error. First, we note that the surveillance tapes do not appear to show Ms. Phillips performing activities that are inconsistent with the sedentary to light duty restrictions placed on her by her doctors. We next point out that some of Ms. Phillips' complaints were corroborated by lay testimony at trial. Lisa Istre, who lived next door to Ms.

7

Phillips from July of 1997 through October of 2000, testified that she has helped Ms. Phillips with her heavy housecleaning, including moving the large plants, cleaning the carpets, and mopping. Ms. Istre testified that she has seen Ms. Phillips grab her neck in pain and complain about picking up a bag of sugar. According to Ms. Istre, Ms. Phillips seems more mobile at some times, but worse at others. Ms. Cormier testified that Ms. Phillips calls her whenever she needs help. She has rearranged Ms. Phillips' furniture and has moved her large plants. In her observation, Ms. Phillips has become worse since their first meeting in March of 2001. Although Ms. Cormier testified that she has seen Ms. Phillips tend to her flowers, she also stated that Ms. Phillips can only do so for about an hour and that pain is evident on her face when she is done.

In *Bergeron v. Cajun Kwik Mart, Inc.*, 03-675, pp. 3-4 (La.App. 3 Cir. 11/5/03), 858 So.2d 748, 750, this court refused to disturb the WCJ's rejection of a forfeiture defense, stating: "While there is some discrepancy between [the plaintiff's] testimony and what is depicted on the surveillance video, we, as did the [WCJ], find that these discrepancies do not equate to fraud, but rather reflect on the extent of her disability." Similarly, in *Palmer v. Schooner Petroleum Services*, 02-397 (La.App. 3 Cir. 12/27/02), 834 So.2d 642, *writ denied*, 03-367 (La. 4/21/03), 841 So.2d 802, we found that variances between the plaintiff's testimony and video surveillance of his activities did not support a finding of fraud, where the plaintiff testified that he has good days and bad days and that he suffers great pain when he exceeds his physical limitations, and where the video showed him walking slowly and tentatively, supporting his claim that he could not walk, stoop, or bend for extended periods of time. In the present case, we find no error in the determination that Ms. Phillips did not commit fraud, given the WCJ's credibility determinations; the corroboration, both lay and medical,

of her complaints; and the videotapes themselves, which do not depict Ms. Phillips performing activities beyond her physical restrictions.

**Penalties and Attorney Fees**

In its second assignment of error, the Diocese argues that the WCJ erred in imposing penalties and attorney fees, given its reliance on the utilization review process in denying the claim and the video surveillance that supported its forfeiture defense. The WCJ imposed these sanctions after determining that the Diocese could not rely on the subsequently-obtained surveillance to justify its failure to approve psychotherapy and biofeedback within sixty days of their request and that the utilization review process was insufficient to reasonably controvert the claim. We find no error.

In *Harrington v. Coastal Construction & Engineering*, 96-681, p. 3 (La.App. 3 Cir. 12/11/96), 685 So.2d 457, 459, *writ denied*, 97-109 (La. 3/7/97), 689 So.2d 1375, we stated that "the employer must rely on competent medical advice *when* the decision to deny the medical treatment is made." Accordingly, we held that the WCJ had erred in refusing to award penalties and attorney fees based upon the employer's decision to schedule an independent medical examination *after* it had already denied treatment. As we explained: "The determination is erroneous because it looks to actions taken *after* the denial of treatment to support the denial of treatment. . . . [T]he [WCJ] was erroneous in utilizing post-denial actions to support a finding that Coastal was not arbitrary and capricious." *Id.* at 459-60.

In *Harrington*, 685 So.2d at 460, we also addressed the reliance on utilization review to controvert a claim as follows:

> In a letter dated November 10, 1995, and signed by a registered nurse, Harrington was informed that his request for physical therapy was denied based upon his "current medical status" and "the information obtained." In *Dozier* [*v. Garan's, Inc.*, 94-1363 (La.App. 3 Cir. 4/5/95), 653 So.2d

9

137], this court held that simply producing a different opinion from a nurse and a doctor who had not examined the claimant did not, at that stage, reasonably controvert the claimant's entitlement to the disputed medical expenses. *Dozier*, 653 So.2d 137. Furthermore, this court found, in *Ramsey v. Cash and Carry Foods, Inc.*, 95-544 (La.App. 3 Cir. 11/2/95), 664 So.2d 511, that a lone report of questionable basis does not constitute "competent medical advice." In the present case, Harrington's request for physical therapy was denied by a nurse who had not examined him, based upon information which is, at best, questionable. The denial letter does not state what the employer thought Harrington's "current medical status" to be, nor does it state what "information obtained" supported this decision. Based upon the jurisprudence established in *Dozier* and *Ramsey*, such evidence does not constitute "competent medical advice" sufficient to avoid the imposition of penalties and attorney fees.

In the present case, the request for psychotherapy and biofeedback was initially denied on February 5, 2001, after a managed care company determined that it was not "reasonably or necessary for this claimant's soft tissue injury." This decision was affirmed on February 28, 2001 and again on July 19, 2001, based upon a determination that "it is not reasonable to assume that a soft tissue injury could have precipitated a major psychiatric illness." On July 25, 2001, Dr. Bramlet disputed this basis for denial, stating: "I am not suggesting that she has a major psychiatric illness. I am reporting that she has an adjustment disorder with both symptoms of depression and anxiety related to a chronic illness, such as a chronic pain disorder, which is clearly indicated from the history gathered from Mrs. Phillips that occurred in October of 1997." (We also note that Ms. Phillips' medical records, including two MRIs showing degeneration in three cervical discs and spondylosis at T6 through T9, indicate that she has more than a soft tissue injury.) The Diocese did not schedule an independent medical examination until September of 2001, six months after its initial denial of the claim, and that physician found that Ms. Phillips could benefit from the requested treatment. Additionally, the surveillance of Ms. Phillips did not take place until July of 2001. Based upon the above, we agree with the WCJ that the Diocese did

not rely on competent medical advice or otherwise reasonably controvert the claim when it was denied in February of 2001. Accordingly, the imposition of penalties and attorney fees was not in error.

In her answer to the appeal, Ms. Phillips asks that we impose an additional penalty for the Diocese's refusal to approve the requested treatment after it received Dr. Anderson's report in October of 2001, indicating that psychotherapy and biofeedback would be beneficial to her. Although the supreme court concluded in *Fontenot v. Reddell Vidrine Water District*, 02-439, 02-442, 02-478 (La. 1/14/03), 836 So.2d 14, that multiple penalties are recoverable under La.R.S. 23:1201, we find that a second penalty is not appropriate in this case. As the WCJ noted in her reasons for judgment, "[t]he videotaped surveillance *would* have constituted a reasonable controversion of Ms. Phillips' request for Dr. Bramlet's recommended treatment had those tapes been 'in hand' six months or so previous to when they were obtained." However, the Diocese did have that surveillance by the time it received Dr. Anderson's report. We agree with the WCJ that the surveillance sufficiently controverted the claim, notwithstanding Dr. Anderson's report. We, therefore, decline to award a second penalty for the denial of Dr. Bramlet's recommended treatment.

In her answer, Ms. Phillips also requests additional attorney fees for work performed on appeal. In *Stacks v. Mayflower Transit, Inc.*, 95-693 (La.App. 3 Cir. 11/2/95), 664 So.2d 566, we held that an appellee who successfully defends a trial court judgment should not be denied additional attorney fees on appeal, even when the relief sought in his answer is denied. In the present case, Ms. Phillips successfully defended the judgment of the OWC in her favor. We, therefore, award her $2,000 in additional attorney fees.

**Decree**

11

For the above reasons the judgment of the Office of Workers' Compensation is amended to award Plaintiff, Donna Phillips, additional attorney fees of $2,000. In all other respects, the judgment is affirmed. Costs of this appeal are assessed to Defendant, the Diocese of Lafayette.

**AFFIRMED AS AMENDED.**