741 So.2d 829 (1999)
Lester SMITH, PlaintiffAppellant,
v.
QUARLES DRILLING COMPANY, et al., DefendantsAppellees.
No. 99-171.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1999.
Writ Denied October 8, 1999.
*830 Michael Benny Miller, Crowley, for Lester Smith.
Foster P. Nash, III, New Orleans, for Quarles Drilling Co., et al.
BEFORE: WOODARD, AMY, and SULLIVAN, Judges.
WOODARD, Judge.
Mr. Lester Smith appeals a workers' compensation judge's decision that he had forfeited his rights to workers' compensation benefits under La.R.S. 23:1208 for apparently failing to reveal his pre-existing past similar problems and injuries to his treating physician. Thus, the workers' compensation judge found that he made knowing misrepresentations of his medical condition for the purpose of securing workers' compensation benefits. We reverse and remand with instructions.

FACTS
On November 4, 1994, Mr. Smith was injured while in the course and scope of his employment as a floor hand with Quarles Drilling Company (QDC). At the time of the accident, he was wearing a hard hat and was working on the floor of a land based drilling rig, when drilling tongs, weighing several hundred pounds, came loose and struck him on the head, knocking him to the floor. Mr. Ronald Guidry, a *831 QDC employee at the time of the accident, described it as follows:
Yeah. I was like four or five foot (sic) away from him.
. . . .
Okay. He was coming out the hole (sic). His brother went down to close the blind rams, and I was locking my tongs on the pipe, and he was trying to get his to lock on the pipe, and I don't know. The air hoists just started going down, and the tongs just come unhook (sic).
Mr. Guidry stated that the three to four hundred pound tongs came loose and hit Mr. Smith in the head, causing him to fall to the floor on his back. When asked whether the blow was a "soft hit," a "glancing blow," or a "direct hit," Mr. Guidry explained that it was a direct, "pretty hard" hit. Specifically, he stated:
Yeah, it was a direct (sic). And where they hit him with it (sic), it looked like it just jarred him in his head like that because he just he crunched up like that before he had he fell on the floor.
Mr. Guidry stated that it took ten minutes for Mr. Smith to stand back up, that he did not look like himself; in fact, he was "almost unconscious," and although his eyes remained opened, Mr. Guidry observed that "he wasn't all there."
Mr. Stanford Smith, Jr., Mr. Smith's brother also employed by QDC at the time of the accident, did not witness the accident. He was on his way downstairs to close a blind ram when he heard a noise, "brang!" He described the noise as "loud" because he heard it over the running rig's motors. He ran upstairs and saw his brother, sitting down right behind the tongs, holding his head. He testified to the following:
Q Okay. Once you got up there, could you tell what had happened?
A Well, yes, sir, I seen (sic) my brother, and the air hoist was all bundled up, and I knew something had happened, you know. And that's when that driller was hollering at us, you know, for him to get up and all that stuff.
Q When you say "get up," asking you to do what?
A To help get my brother up. He couldn't we couldn't get him up because he was he was out, you know. It was like he was looking at us funny  looking at me funny, you know what I'm saying.
Mr. Smith alleged that the impact shocked his whole body. Asked whether he was unconscious, he stated:
Well, a certain part of time (sic), I didn't see nothing (sic). So I don't know. I can't tell you if I was or if I wasn't. I know I was on the ground, and I got when I was when I came to, I was sitting like that shaking my head because I couldn't hear nothing (sic). But I was on my back knocked out, I guess. I don't know.
After the accident, Mr. Smith continued with his work for three days. He explained how he terminated his work for QDC, when he was asked during trial, whether and why other members of his crew walked off the job with him. He responded:
They left when I left because they seen (sic) what happened to me and how the driller treated me because every time I'd tell him I was hurt and needed a doctor, he told me to get out of his face and get to work and quit faking. That's why they left. They did not want to be treated like that.
And the only time I could leave is when they had a crew change. I had to come from Texas with people I didn't even know man, just to go to the doctor, okay. I had to suffer a long time, man. That that's something y'all (sic) need to know. I think three days of suffering trying to do your job, that's wrong, man, to make me do that.
*832 On November 14, 1994, Mr. Smith consulted with Dr. G. Gregory Gidman, an orthopedic specialist, who had treated him in a previous accident (accident I) which had occurred on April 26, 1989, when he was coming back from the service. Mr. Smith had enrolled as a Police Officer for the Vermillion Parish Sheriff's Department and was injured while in the course and scope of his employment. When on patrol in a police car, a truck ran a stop sign, hitting his vehicle, head-on. Although Mr. Smith was wearing his seat belt, the back of his head hit a shotgun rack, knocking him unconscious for nearly five minutes. The ailments that he suffered as a result of accident I were, among others; sharp shooting pains down his neck, ringing of the ears, headaches, difficulty sleeping, aching all over, and diminished concentration. During the course of his treatment, he also consulted with Dr. Bradley J. Chastant, an otolaryngologist specialized in head and neck surgery, Dr. Robert D. Martinez, a neurologist, and F.T. Friedberg, a clinical psychologist. Although the imaging studies were negative, Dr. Martinez opined that Mr. Smith was suffering from the effects of posttraumatic syndrome.
Mr. Smith claims that he had completely recovered in 1990, from this accident, before he started working for QDC. Mr. Stanford Smith, Sr., Mr. Smith's father, verified that, indeed, his son had fully recuperated from accident I by the time he started working at QDC. Additionally, Mr. Smith's brother, Mr. Guidry, and Mr. Marvin V. Heath, Jr., Mr. Smith's brother-in-law, assert that Mr. Smith did not complain of any head or neck problems when he worked at QDC. Also, Dr. Martinez opined that he did not see any reason to believe that Mr. Smith presented any permanent disabling condition after accident I. Finally, Mr. Smith did not consult with any physician for problems related to accident I for some time before the occurrence of the 1994 accident at QDC (accident II).
During trial, Mr. Smith stated that he consulted with Dr. Gidman in 1994, because he knew him from accident I. Indeed, Dr. Gidman's medical reports establish that he saw Mr. Smith regularly for a period of time, ranging from April 26 to September 15, 1989.
Prior to seeing Mr. Smith for the initial November 14, 1994 visit, Dr. Gidman received a fax from QDC which informed him of the following:
Please be advised that this patient sustained a light blow to the top of his head from tongs. He had his hard hat on, and the bolw (sic) was gentle, from 3 inches above. We offered treatment for this employee twice on the date of the accident and it was refused. I will expect a report from your office before any further treatment is rendered. Please be advised that we require urine testing for the presence of alcohol and drugs at the time of initial medical service which would be your office visit today.
(Emphasis added.)
During the visit, Dr. Gidman reported that Mr. Smith was complaining of "a shooting, tingling in the head that goes to the neck and the left shoulder down the arm. In the lower back, it does (sic) down to the right hip. It is severe. It is constant. Worse by movement. Better by nothing." At the conclusion of the visit, on behalf of QDC, Dr. Gidman requested that Mr. Smith submit to a urine and alcohol test to be conducted at the Lafayette General Medical Center. The test came back negative for all drugs tested and alcohol. Mr. Smith again saw Dr. Gidman on November 23, 1994. Dr. Gidman issued a report wherein he stated that because of head complaints, "I will have a neurologist, Dr. Snatic, evaluate the patient." Mr. Smith told Dr. Gidman that he would rather see Dr. Martinez, because, he explained, Dr. Martinez was his former treating neurologist. He asserts that Dr. Gidman told him "No. Just go to Dr. Snatic."
*833 After accident II, and in addition to Dr. Gidman and Dr. Snatic, Mr. Smith was either treated or examined by the following physicians: Dr. Chastant, for problems relating to his ears; Dr. Martinez, for a second neurological opinion; Dr. Thad S. Broussard, an orthopedic specialist, for an Independent Medical Evaluation (IME). Additionally, he consulted various physicians at the Acadiana Mental Health Center (AMHC), the University Medical Center (UMC) in Lafayette, Louisiana, and the Medical Center of Louisiana in New Orleans. In summary, the following ailments or symptoms were recited, to wit: glossy-type eyes, glazed appearance and loss of coherence, hearing loss in both the right and left ear. More importantly, he described the severe headaches episodes, which sometimes led to vomiting and loss of consciousness.
Mr. Smith filed a petition on December 6, 1994, requesting that QDC and American International Group (AIG), QDC's workers' compensation insurer, provide him with workers' compensation benefits. A trial was held on July 16, 1998. In a judgment signed on November 18, 1998, the workers' compensation judge found that Mr. Smith forfeited his right to all compensation benefits and medical expenses under La.R.S. 23:1208 based on her findings that he had failed to reveal his pre-existing past similar problems and injuries. Mr. Smith appeals.

ASSIGNMENTS OF ERROR
Mr. Smith asserts that the workers' compensation judge erred in: (1) finding that he violated La.R.S. 23:1208 and (2) failing to award him weekly compensation benefits, penalties, and attorney's fees.

LAW

FORFEITURE OF BENEFITS
Mr. Smith alleges that the workers' compensation judge manifestly erred when finding that he had violated La.R.S. 23:1208 when he failed to reveal pre-existing past similar problems to Drs. Gidman, Martinez, and Snatic. On the contrary, he claims, in essence, that he did not tell Dr. Martinez or Dr. Gidman of such prior past similar problems because he assumed that they already knew about them since they had treated him for those problems from accident I. Also, he states that his hearing loss and defective memory could account for any erroneous information that he may have provided.
A forfeiture of benefits may occur under the circumstances set forth in La.R.S. 23:1208, in pertinent part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
. . . .
E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
(Emphasis added.) In Resweber v. Haroil Const. Co., 94-2708 (La.9/5/95), 660 So.2d 7, 12, the Louisiana Supreme Court stated that a party may satisfy its burden of proving a forfeiture under La.R.S. 23:1208 when "(1) there is a false statement or representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit or payment." Nevertheless, forfeiture of workers' compensation benefits is a harsh remedy; thus, statutory forfeiture must be strictly construed. Benoit v. Frank's Casing Crew, 97-1522 (La.App. 3 Cir. 5/20/98), 713 So.2d 762, writ denied, 98-1697 (La.10/9/98, 726 So.2d 31);. Also, the beneficent purpose of Workers' Compensation Law requires that its provisions be interpreted liberally in favor of the employee. Darbonne v. M & M Right of Way Contractors, 96-1730 (La.App. 3 Cir. 4/30/97), 693 So.2d 299.
*834 The issue whether an employee forfeited his workers' compensation benefits is one of fact, which we shall not reverse on appeal, absent a manifest error. Jones v. Trendsetter Prod. Co., Inc., 97-299 (La.App. 3 Cir. 2/25/98), 707 So.2d 1341, writ denied, 98-793 (La.5/15/98), 719 So.2d 463; Grant v. Natchitoches Manor Nursing Home, 96-1546 (La.App. 3 Cir. 5/14/97), 696 So.2d 73, writ denied, 97-1582 (La.10/17/97), 701 So.2d 1330.
At the outset, we note that both Drs. Martinez and Gidman treated Mr. Smith for accident I, and again, after accident II, Mr. Smith spontaneously sought treatment from both of them. Such facts discredit the supposition that Mr. Smith knowingly misrepresented his medical condition for the purpose of securing workers' compensation benefits, as it is commonly known that doctors maintain records of their treatment of their patients.
Specifically, reports from Drs. Gidman, Martinez or Dr. Snatic, reflect that Mr. Smith answered their question, regarding prior problems, by providing the following information: "No prior similar problems," "never had symptoms quite like this before," or "he appears to indicate that basically he has never had problems like this before." (Emphasis added.) From these statements, the workers' compensation judge concluded that "[b]y denying past similar problems, Smith knowingly made false representations to physicians for the purpose of securing workers' compensation benefits." We cannot agree with this conclusion.
When Mr. Smith's statements are examined in the context of his past treatment with Drs. Gidman and Martinez, we read them to mean that he attempted to explain to his past and present physicians that his symptoms are worse than those he previously suffered. Indeed, he asserts that his current symptoms, although similar in nature, are a lot worse than those suffered after accident I. Dr. Martinez's report dated February 23, 1995 provides, in pertinent part:
The patient tells me that he has never had symptoms quite like this before. I pointed out to him that when I had seen him back in 1989 that indeed he did have symptoms of a muscular type with headache, difficulty sleeping, aching all over, pain into his neck and left arm, and pain into his back and left leg. In addition to this, he also had the complaint of this shooting pain down his back and I even made a mention of something like a Lhermitte's phenomenon. The patient states that he does not remember that specifically.

(Emphasis added.) First, we find that when stating that "[t]he patient states that he does not remember that specifically," Dr. Martinez apparently referred to Mr. Smith's lack of recollection of being diagnosed with the Lhermitte's phenomenon, rather than a denial of prior similar symptoms. Second, when asked, during his January 8, 1996 deposition, whether Mr. Smith could have misunderstood his question to mean "the same [problem] but worse," Dr. Martinez answered: "Sure. That can very definitely there can be miscommunication."
Finally, we do not read Dr. Snatic's report to provide any ground worthy of subjecting Mr. Smith to a La.R.S. 23:1208 forfeiture. Dr. Snatic noted that Mr. Smith "appears to indicate that basically he has never had problems like this before. (Emphasis added.) On specific questioning, he admits to having headaches in the past but not of this intensity or severity. He denies any prior injuries except to the right ankle." We do not deduce any attempt to misrepresent in this statement. On the contrary, we find that Mr. Smith substantially strived to communicate the fact that he had in the past a similar, albeit different in extent, kind of problem.
Thus, based on the entirety of the record, we find it neither accurate nor reasonable to interpret Mr. Smith's statements as knowing and false representations, *835 made for the purpose of obtaining workers' compensation benefits. Accordingly, we find that the workers' compensation judge's decision was manifestly erroneous and reverse.

WORKERS' COMPENSATION BENEFITS
Mr. Smith alleges that the fax which QDC sent to Dr. Gidman, prior to his consultation with Mr. Smith, served to deny him adequate medical treatment, in that it operated to cast a doubt on the legitimacy of his accident, thus, portraying him as a malingerer.
He also asserts that, due to his physical infirmities resulting from accident II, he still is unable to resume work. Additionally, while he and Mr. Heath were watching the Superbowl on television on January 25, 1998; he had a headache episode which caused him to break into a sweat, vomit, pass out, and fall onto the floor, breaking his wrist. Mr. Heath confirmed that Mr. Smith's fall did not occur because of a slip and fall accident. Further, unrebutted testimony establishes that he had not been drinking.
The workers' compensation judge dismissed Mr. Smith's claim on the ground that he had forfeited his rights to workers' compensation benefits under La.R.S. 23:1208, but did not address the merit of his claim to workers' compensation benefits. We review this issue de novo.
It is well settled that an employer has a duty to provide an employee, who was injured during the course and scope of his employment, with "all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal." La.R.S. 23:1203(A). This statute shall be read in conjunction with La.R.S. 23:1121(B), see McLaughlin v. Hill City Oil Co., 97-557 (La.App. 3 Cir. 10/8/97), 702 So.2d 786, writ denied, 97-2797 (La.2/13/98), 706 So.2d 994. La.R.S. 23:1121(B) provides, in relevant parts:
The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary proceeding, provided for in La.R.S. 23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain prior consent from the employer or his workers' compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
In the case sub judice, although Dr. Gidman was Mr. Smith's initial choice of orthopedist, the evidence reveals that QDC, attempted to undermine that relationship and predispose Dr. Gidman to its favor by giving him, prior to his evaluation, information which was neither corroborated during the hearing, through deposition, nor by any other evidence; namely, that Mr. Smith received a light blow to the head. This was apparently compounded by AIG's contact with Dr. Gidman through Andrea Bertinelli, an AIG subsidiary employee, who was also a personal friend of Dr. Gidman. Regarding the erroneous and prejudicial information supplied to Dr. Gidman, his November 14, 1994 report reflects the peculiarity of the situation. He noted:
You kindly sent me a fax, dated 11/4/94, describing the injury. It was a light blow to the top of his head from tongs. He had his hard hat on and the blow was gentle from 3 inches above. Treatment was offered to the patient twice on the day of the accident and it was refused. I discussed the report of his injury with the patient. Unfortunately he has a completely different description of the accident in that he states that the tongs weighed between 250-300 lbs. They hit him on the back of his head, knocking him to the floor. He was wearing a plastic hard hat. The patient describes the injury as a massive blow to the hard hat. He states that it was not a gentle blow but, as he describes it, it hit him *836 bad to the head, neck, lower back and left shoulder. He states that he was not offered any medical treatment, he was offered nothing. He states that the driller told him that if he didn't get his "a-" off the floor, he wouldn't have a job. As you can tell, there are two very different descriptions of the accident and which one actually occurred, I have no way of knowing. I am just reporting what was written to me by you, Ms. Quarles, and what was related to me by the patient.
(Emphasis added.)
We also find peculiar the circumstances which led to Dr. Gidman's opinion that Mr. Smith had reached maximum medical improvement (MMI). The record contains a note, inserted on July 10, 1995 in AIG's file activity sheet, which reflects the following:
Andrea Bertinella, AIHRS called
. . . .
Andrea is personal friend with Dr. Gidman clmt's (sic) treating physician, She'll find out exact medical status of clmt (sic).
Later, on July 17, 1995, Dr. Gidman's report opined that Mr. Smith had reached MMI. One day later, another entry in the AIG's file activity sheet, dated July 18, 1995, reports as follows:
Andrea Bertinelli, AIHRS, rehab called. She got (sic) MMI from Dr. Gidman.
The aforementioned notes apparently refer to Ms. Andrea Bertinelli, a rehabilitation counselor with American International Health Rehabilitation Services Inc. (AIHRS), an AIG subsidiary.
In his January 2, 1996 deposition, when asked to state the reasons which motivated his finding that Mr. Smith had reached MMI, Dr. Gidman stated:
Q: So it was kind of impossible for you to come up with the conclusion that he was at maximum medical improvement at that particular point in time because you did not have any factual information or medical information to indicate which way it was going?
A: I had not seen him since the end of January 1995, that is correct.
. . . .

It is true that I did not examine the guy, I didn't talk to him and I really did not know his clinical situation when I talked to Andrea in July.

. . . .

I was told that he was not seeing any physicians and that, I think, nothing else had changed.
(Emphasis added.)
In his testimony, Mr. Smith stated that Dr. Gidman "didn't believe nothing (sic) I told him. It was like talking to a wall." He specified: "I didn't feel that was right that a doctor shouldn't believe (sic) his patient you know. I told him what happened. I explained to him how it jarred my neck into my back. He wouldn't even want (sic) to listen to that." Then Mr. Smith asserted that he attempted to change physicians, but AIG denied his request.
Dr. Gidman's report, dated November 23, 1994, explains that because of Mr. Smith's head complaints, "I will have a neurologist, Dr. Snatic, evaluate the patient." Mr. Smith requested to be referred to Dr. Martinez, a reasonable and beneficial choice for Mr. Smith's care because of Dr. Martinez' prior experience and familiarity with and first hand knowledge of the patient's history, but Dr. Gidman refused. Dr. Snatic examined Mr. Smith on one occasion, on December 7, 1994. He opined that Mr. Smith's neurological examination was objectively normal, stating: "And I thought that his complaints were quite similar to things that he complained about five years previously when he saw Dr. Martinez."
Dr. Martinez saw Mr. Smith for a second opinion on February 23, 1995. Explaining the circumstances under which the visit took place, Dr. Martinez stated:

*837 I explained to him that my position in evaluating him was for a second opinion and neurological consultation, and not to be his treating physician. He stated "I wasn't sure that Mr. Smith understood yet the facts that I'm not his treating physician. I did, however, tell him that in no uncertain terms."
At the termination of the examination, Dr. Martinez opined that Mr. Smith did not have any neurological involvement, but added:
I would judge his neurological examination to be normal. His imaging studies add credibility to this impression. I have no recommendation as to treatment for this gentleman. At most, I would recommend conservative management only.
Nevertheless, in his January 8, 1996 deposition, Dr. Martinez related the symptoms Mr. Smith suffered as a result of accident I with those suffered as a result of accident II. He opined that, after accident I, Mr. Smith had suffered from posttraumatic syndrome. At that time, the imaging studies did not reveal anything abnormal. He stated: "[t]here was no evidence on imaging studies that there was any structural abnormality.... So I believe that he did have a posttraumatic syndrome with manifestations as outlined by Dr. Friedberg." He described posttraumatic syndrome as follows: "A post traumatic disorder is when an individual actually has a trauma and then has symptoms following that are related to the trauma itself." Asked if glazed eyes, memory failure, and all other symptoms described by Mr. Smith after accident II would persuade him to refer Mr. Smith to Mr. Friedberg, Dr. Martinez stated: "I would recommend at least a neuropsychological examination and evaluation. I think it would be I think it would be appropriate." In conclusion to his deposition, the following exchange took place between Dr. Martinez and Mr. Smith's counsel, in pertinent part:
Mr. Miller: Doctor, just one follow up question.
If you assume that at the time you saw Mr. Smith he stated the history as you stated in your report, that since at that time he has not been involved in any other accidents, he has not had any of his family, in other words, had died or any very traumatic event such as that, and that nothing has happened of that nature since the time he saw you, and that he exhibits the same complaints as when he saw you, plus the fact the telephone call when he called you, plus the fact that he has glazed eyes and that he has a difficult time understanding, assuming those to be the facts, could you not relate that to the original trauma back in 1994.
Dr. Martinez: I would not be prepared to do that without the support or recommendation that such exists with neuropsychological testing. I would state this, however, that it might be that the patient feels that these are all connected and related, and that may, indeed, be the fact, but that would be for the neuropsychologist or psychiatrist to determine.
Finally, on March 4, 1996, Dr. Martinez was provided by counsel for appellees with a letter, stating the following:
Recently, you indicated that it might be a good idea for the claimant to be examined by Dr. P.T. Friedberg, a neuropsychologist. We would ask that you provide us with answers to the following questions in connection with that examination:
1. Whether treatment by Dr. Friedberg is necessary; and
2. Whether treatment be Dr. Friedberg is related to the November 4, 1994 accident.
Dr. Martinez answered the first question, stating: "This depends on what Dr. Friedberg finds on observation and evaluations." To the second question, he answered: *838 "You would have to ask Dr. Friedberg to answer this question."
After reviewing the record thoroughly, we find that as a result of the actions of AIG, QDC, and Dr. Gidman, Mr. Smith was denied adequate medical treatment. We are impressed by the fact that Mr. Smith received a several hundred pound blow to the head hard enough to knock him to the floor, which, by any acceptable standard, may never qualify as a "light blow." Obviously, if anything, Mr. Smith's problem is neurological or neuropsychological, as opposed to orthopedic. Under the circumstances of this case, Dr. Martinez appears to be as close to a treating neurologist as Mr. Smith had since accident II. Apparently, he would refer Mr. Smith to a neuropsychologist or a psychiatrist. Therefore, we remand the case with instructions that Mr. Smith be given an opportunity to consult with one of the above, after which medical reports from Mr. Smith's choice of treating neurologist and neuropsychologist are to be filed with the Office of Workers' Compensation for the purpose of determining whether Mr. Smith is entitled to total temporary disability benefits, penalties, and attorney's fees.

CONCLUSION
For the aforementioned reasons, we reverse the workers' compensation judge's decision that Mr. Smith forfeited his workers' compensation benefits and remand, ordering that he be given an opportunity to consult with a neurologist or neuropsychologist of his choice and file the resulting evaluation with the workers' compensation court to have the workers' compensation judge determine whether he is entitled to total temporary disability benefits, penalties, and attorney's fees.
REVERSED AND REMANDED WITH INSTRUCTIONS.
AMY, J., concurs in part and dissents in part and assigns reasons.
AMY, J., concurring in part and dissenting in part.
I agree with the majority that the dismissal of the plaintiffs claim on the basis of forfeiture of benefits should be reversed. However, I dissent from the remainder of the opinion as I find that determinations regarding the necessity of medical treatment and entitlement to workers' compensation benefits would be more appropriately addressed by the trial court, a determination originally pretermitted by the trial court's decision regarding La.R.S. 23:1208. Therefore, I would remand these matters to the workers' compensation judge for further proceedings.