# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-1049


BRENDA JEANISE

VERSUS

TOMMY CANNON D/B/A RENTAL WORLD, INC.


**\*\*\*\*\*\*\*\*\*\***


## APPEAL FROM THE
## OFFICE OF WORKERS' COMPENSATION - DISTRICT # 3
## PARISH OF CALCASIEU, NO. 02-04965
## HONORABLE SAM L. LOWERY, WORKERS COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***


## JAMES T. GENOVESE
## JUDGE

**\*\*\*\*\*\*\*\*\*\***


Court composed of Chief Judge Ulysses Gene Thibodeaux, Marc T. Amy, Elizabeth A. Pickett, J. David Painter, and James T. Genovese, Judges.


**REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.**

**Thibodeaux, C.J., concurs in part and dissents in part and assigns reasons.**

**Amy, J., concurs in part and dissents in part and assigns reasons.**

**Painter, J., concurs in the result.**


Michael B. Miller
Attorney at Law
P. O. Box 1630
Crowley, LA 70527-1630
COUNSEL FOR PLAINTIFF/APPELLEE:
    Brenda Jeanise

**Thomas J. Solari**
**Woodley, Williams, Law Firm, L.L.C.**
**P. O. Box 3731**
**Lake Charles, LA 70602-3731**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Tommy Cannon d/b/a Rental World, Inc. and**
**Louisiana Workers' Compensation Corp.**

GENOVESE, Judge.

Defendant, Tommy Cannon d/b/a Rental World, Inc. (Cannon), appeals the judgment of the Workers' Compensation Judge (WCJ) reinstating workers' compensation and medical benefits of Claimant, Brenda Jeanise, and awarding her penalties and attorney fees. We reverse in part, affirm in part, and render.

## FACTS AND PROCEEDINGS BELOW

After the February 4, 2004 hearing on this matter, the WCJ took the case under advisement to examine the medical records and depositions, and to view the video surveillance tape, which was the linchpin of Defendant's case. The tribunal was called back into session on March 15, 2004, and the WCJ issued the following oral reasons for judgment:

> This claim originally arose as a result of an accident and an injury sustained by the plaintiff, Brenda Jeanise, on December the 22nd, 19[9]7 while employed by Rental World. There was a previous trial on the merits of this case some three years ago presided over by the late Judge Constance Handy who rendered a judgment on January the 30th, 2001, which, among other things, increased the claimant's weekly indemnity rate and awarded penalties and attorney's fees.

> The current matter came before the court on February the 4th, 2004. The claimant asked for penalties and attorney's fees because of the defendant's alleged failure to approve certain injections, failure to pay mileage properly on three separate occasions, and primarily the insurer's termination of all medical and weekly benefits on December 17, 2003. The defendant, on the other hand, insists that the claimant has committed fraud under Louisiana Revised Statute 23:1208. Additionally, the defendant asks for a determination from the court as to whether they are obligated to supply a back brace which was prescribed by the claimant's treating orthopedic surgeon.

> The issue upon most -- the issue upon which most of the sum [sic] seven hours of live testimony focused was L.W.C.C.'s contention that Ms. Jeanise forfeited all benefits because of her alleged violation of 23: 1208. The defense cited in support of their position their interpretation of a prodigious amount of medical evidence which has been amassed during the more than six years since the date of injury as well as what they perceive to be inconsistent statements and inappropriate behavior by the claimant. The centerpiece of their evidentiary offerings was a video surveillance tape taken to pictorially prove the existence of fraud.

1

At the close of live testimony, the court went into recess in order to more carefully read the medical reports and to view and review the film. An analysis of the medical records and the video, coupled with an evaluation of the veracity of the live witnesses, forms the basis for the court's opinion which I am rendering today.

The medical reports are all over the map and are less than instructive. They were produced over a six-year period from experts in a wide variety of medical specialties, including but not limited to general practice, neurosurgery, psychiatry, psychology, orthopedic surgery and pain management. Some of the medical experts were hired by the claimant. Some were hired by the defendant and one was appointed.

The dates of the medical opinions range from relatively recent to many years old. They're from a doctor who treated the claimant for one reason or another more than 20 years ago and a physician who saw her only months ago. One orthopedic surgeon considers this woman to be in genuinely -- to be genuinely in debilitating pain and another says that she is a malingering, lying fraud, period. One doctor terminated his relationship with her because he suspected she is abusing narcotics. Another expert says that the claimant shows a low probability for drug abuse, and he was adamant that he saw absolutely nothing in her behavior to enhance or even support the defense's claim that the claimant was engaging in symptom magnification. One doctor said her initial injury would have produced an injury which should have resolved itself in a few days. Others opine that it's difficult to see her returning to any gainful employment in the foreseeable future. A functional capacity evaluation produced results which were touted by both the defense and claimant as strong proof of their respective opposing positions. The administrator of the F.C.E. at some length categorized the findings of his study as "equivocal," a term which he attempted, with mixed success, to explain to anybody's satisfaction.

In short, the medical evidence produced a reservoir which contained information, inferences, and opinions which both defense and claimant counsel used to support their respective positions. It is impossible to point to a single medical expert who provided a diagnosis which is clearly dispositive of the issue of fraud.

Now, taking a broad look at the medical picture as a whole, I find the depositions of Dr. Bernauer, Dr. Boutte, Dr. Lew, Dr. Shirley, and Dr. Yadalam all to be consistent in showing that the claimant does indeed have substantial problems, both physically and psychologically. I also note that the I.M.E. physician placed substantial restrictions on Ms. Jeanise. The records of Dr. Perry, the defendant's physician who was the most adamant about Ms. Jeanise's commission of fraud, all predate the first trial in this matter which was held years ago.

2

Dr. Yadalam, a psychiatrist to whom the patient was referred by her pain management physician, treated the patient for about five years; and he seemed to be conversant with her and he was unwavering in his assessment that during his treatment of her there was nothing to indicate she was malingering or that she was abusing medication. He was just as clear on his assessment of her ability to work. He said, quote, if she didn't have the physical problems she has, then she could probably do some jobs, end of quote. He added that, quote, she has some psychological problems because of her physical limitations. Dr. John Boutte, a psychologist who specializes in patients with chronic pain, to whom she was referred by one of her treating physicians, saw the claimant from January the 17th, 2002 to April the 17th, 2003. He testified that the claimant suffered chronic pain and that he saw her -- and he saw her to determine how much of a problem her depression and anxiety played with that pain. Dr. Boutte conducted a battery of tests to determine what he called a, quote, pain profile, the results of which he said indicated clearly that the claimant was experiencing above average depression, anxiety, and pain complaints when compared to other pain patients. He said that based on the extensive tests he administered, she was having a great deal of difficulty coping with her level of pain; and he was absolutely insistent that she was neither malingering nor exaggerating. When asked that question directly by the defense counsel, Dr. Boutte replied that there were, quote, no red flags. When he -- when asked pointedly, he replied directly that she showed low probability of drug abuse. In sum, he said nothing to enhance or even support the defense's claim that the claimant is malingering or committing fraud in this process.

Dr. Dale Bernauer has treated the claimant for years. The first time for a knee injury in '83; and he was her treating physician for the injury she received, which is the genesis of this particular litigation. Dr. Bernauer agreed with the defense counsel that it might be difficult to say that more probably than not her present back complaints were related to her injury. However, he took pains to say he would not say that the lumbar complaints are not related, simply that he could not relate them given the circumstances. He made a point to agree with the plaintiff['s] counsel that during her treatment he never saw anything that she did or complained of that was inconsistent with the type of injury she was complaining she had.

Much was made of Dr. Gorin's termination of the treatment of Ms. Jeanise because of his suspicion that she was abusing drugs he prescribed and that she was engaging in physical activities which suggested she was being less than honest with him. Dr. Gorin, whose memory of the circumstances upon which the suspicion was based, appeared to be less than precise as he explained that a pharmacist had called his office several years ago and told the clerk that Ms. Jeanise tried to work out an arrangement with the pharmacy to get money instead of her prescription. The story is not all that clear, owing partly to the fact that all of this has occurred more than two years ago and the

fact that the pharmacist is now deceased. The claim[ant's counsel] made a well-founded objection that this entire line of testimony was hearsay but it was admitted over his objection.

From the beginning of the trial, the defense counsel promoted and advertised the video as definitive, irrefutable, black-and-white evidence that the claimant was capable of doing more than what she stated in her deposition. For that reason, I watched the video twice, once right after the testimony ended so I would have the facts clear in my mind, and again the next day to ensure I didn't miss anything. Succinctly, and charitably put, this video is a less-than-one-hour compilation of snippets and anecdotal situations covering a span of more than six years of the claimant's life. About all a fair-minded person can conclude from this film is that the woman is far worse off physically now than she was six years ago. Showing that she picked up a board in 1998 is well short of producing a smoking gun in proving fraud. That she used a cane when she went to her doctor's office and did not use one when taking out her trash is persuasive evidence only in the eye of a beholder who knows what he wants to see based on what he already believes. Her explanation for this behavior was reasonable. She drove a long way to the doctor's office in Lake Charles and was somewhat unsteady on her feet and stiff when she arrived. She used the cane as she negotiated across the parking lot. When she was in her back yard or other places, she didn't always use the cane. In fact, all of her explanations of the accusations, I think, were answered reasonably and I think truthfully.

The Supreme Court's recent *Resweber* [1]opinion and its stated guidance on the issue of fraud simply cannot be stretched and extended to cover the circumstances in this case. Therefore, the request for sanctions under R.S. 23:120[8] are denied and the defendants are ordered to reinstate Ms. Jeanise's weekly compensation benefits and medical benefits.

Additionally, the defendant is assessed a total of $6,000 in penalties for failure to pay mileage requests submitted on April the 11th, 2002, September 26, 2002, and March 20, 2003. And for having no reasonable medical excuse to deny the request by Dr. Lew to administer injections, the defendants are assessed $2,000. An additional $4,000 is assessed for L.W.C.C.'s termination of weekly and termination of benefits of -- compensation and medical benefits [sic]. None of the reasons cited by the defense for doing so are reasonable, appropriate, or believable.

The back brace submitted Dr. Bernauer will be provided by the defendants.

---

[1]*Resweber v. Haroil Construction Co.,* 94-2708 (La. 9/5/95), 660 So.2d 7.

I won't argue with the claimant's counsel that this is a particularly complex case, but I find that an award of $12,000 is more appropriate than the nearly $20,000 he requests.

The Defendant appeals alleging that the WCJ erred in reinstating Claimant's benefits, that he erred in ordering Defendant to supply the back brace ordered by Dr. Bernauer, and that the WCJ erred in assessing penalties and attorney fees against the Defendant.

## LAW AND DISCUSSION

**Appellate Review**

In a workers' compensation case, a claimant must prove by a preponderance of the evidence (1) that an employment accident occurred, and (2) that the accident had a causal relationship to the disability claimed. If the testimony and documentary evidence leave the probabilities evenly balanced, the claimant has failed to carry his burden of proof. *Grant v. Assumption Parish Sch. Bd.,* 01-0272 (La.App. 1 Cir. 3/28/02), 813 So.2d 622; *Harvey v. Bogalusa Concrete, Inc.*, 97-2945 (La.App. 1 Cir. 9/25/98), 719 So.2d 1130; *Wilkerson v. City of New Orleans Fire Dep't.*, 03-1550 (La.App. 4 Cir. 3/3/04), 871 So.2d 375, *writ denied*, 04-1548 (La. 10/1/04), 883 So.2d 992.

The law applicable to the appellate review of workers' compensation cases is likewise well settled:

> Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Banks v. Industrial Roofing & Sheet Metal Works*, 96-2840, p. 7 (La.7/1/97), 696 So.2d 551, 556; *Smith v. Louisiana Dep't of Corrections*, 93-1305, p. 4 (La.2/28/94), 633 So.2d 129, 132; *Freeman v. Poulan/Weed Eater*, 93-1530, pp. 4-5 (La.1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Banks*, 96-2840 at pp. 7-8, 696 So.2d at 556; *Freeman*, 93-1530 at p. 5, 630 So.2d at 737-38; *Stobart v. State*, 617 So.2d 880, 882 (La.1993). Where there are two permissible views of the evidence, a factfinder's choice between them

can never be manifestly erroneous or clearly wrong. *Banks*, 96-2840 at p. 8, 696 So.2d at 556; *Stobart*, 617 So.2d at 882. "Thus, 'if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Banks*, 96-2840 at p. 8, 696 So.2d at 556 (quoting *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990)).

*Seal v. Gaylord Container Corp.*, 97-0688, pp. 4-5 (La. 12/02/97), 704 So.2d 1161, 1164.

**Res Judicata**

Defendant raised the issue of res judicata with respect to Claimant's lower back complaints based upon one sentence in a prior judgment in this case rendered January 30, 2001 (emphasis ours): "the medical records *offered into evidence* do not show a connection between the lumbar are[a] and the injuries originally mentioned at the time of the accident." This argument may be disposed of readily. First, Defendant failed to adhere to the provisions of La.Code Civ.P. art. 927, which requires that the exception of res judicata be specifically pled. Defendant did not specifically plead this exception. Additionally, the jurisprudence is clear:

> Ordinarily, once a judgment becomes final and definitive, parties are bound by it regardless of a subsequent change in circumstances. Workers' compensation judgments, however, are treated differently from ordinary judgments. This is due to the fact that if the rules of finality applied to ordinary civil judgments are applied to workers' compensation judgments, the flexibility of the workers' compensation system would be greatly restricted. Where the legislature has expressly provided that an award or judgment can be subject to a claim of modification, res judicata does not apply. Under LSA-R.S. 23:1310.8, a compensation award may be modified by either party because of change in disability after an award has been made.
>
> > The modification statute is to be liberally construed in favor of the claimant, and that through it, the Legislature did not intend that a judgment determining the extent of a claimant's disability be res judicata, it having expressly provided that a compensation award can be subject to modification based on a change in the worker's condition. The power of modification, while not a substitute for the

6

> appellate process, exists for the purpose of modifying awards due to a change in the worker's condition.
>
> Within the entire scheme [of worker's compensation], the concept of modification is unique because it allows a case to be reopened and the award amended after the judgment becomes final. The purpose of the modification statute is to allow adjustments to be made after judgment "to insure that the employee will be paid compensation during the full period of his disability and that the employer will not be required to pay for any longer than this period of disability." Where the legislature has expressly provided that an award or judgment can be subject to a claim of modification, res judicata does not apply.

*Madere v. W. S. Life Ins. Co.*, 03-110, pp. 4-5 (La.App. 5 Cir. 4/29/03), 845 So.2d 1222, 1225 (footnotes omitted).

The very nature of workers' compensation proceedings rarely allows the application of the res judicata principle. So long as the case is subject to being re-opened, the concept cannot apply. Only when the case has become final and no further proceedings are legally permissible, will the concept be considered by our courts.

Thus we are left to consider only three issues: (1) the extent of Claimant's disability; (2) the merits of Defendant's claim of fraud; and (3) whether the penalties and attorney fees awarded were warranted.

**Disability**

As to the issue of disability, the Louisiana Supreme Court has stated:

> As in other civil suits the employee in a worker compensation proceeding initially has the burden of establishing his disability and its causal relation with the employment accident by a preponderance of the evidence. *Lucas v. Ins. Co. of N.A.*, 342 So.2d 591 (La.1977); *Prim v. City of Shreveport*, 297 So.2d 421 (La.1974). Malone & Johnson, 13 Louisiana Civil Law Treatise, Worker's Compensation (2d ed.) § 256, p. 562. In order for the employee to recover, it must be determined that the employment somehow caused or contributed to the disability, but it is not necessary that the exact cause be found. *Lucas v. Ins. Co. of N.A., supra* ; Malone & Johnson, *supra*. A claimant's disability is presumed to have resulted from an accident, however, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously

manifest themselves afterwards, providing either that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition, *Allor v. Belden Corp.*, 393 So.2d 1233 (La.1981); *Lucas v. Ins. Co. of N.A., supra*, or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection. *Haughton v. Fireman's Fund American Ins. Cos.*, 355 So.2d 927 (La.1978); Cf. *Thomas v. U.S. Cas. Co.*, 218 Ga. 493, 128 S.E.2d 749 (1962); Malone & Johnson, *supra*.

*Walton v. Normandy Village Homes Association, Inc.*, 475 So.2d 320, 324 (La.1985).

In the case sub judice, the WCJ considered all the testimony and documentary evidence, especially the surveillance video touted by the Defense, and reached the following conclusions: (1) that Claimant remains disabled and that her benefits were wrongly terminated; (2) that the evidence relates her current back symptoms to her original injury and, thus, she is entitled to treatment arising therefrom, including injections recommended by Dr. Lew, and the back brace recommended by Dr. Bernauer; (3) that Claimant is entitled to penalties because of Defendant's actions in connection with the first two items, as well as for three separate instances of failure to timely pay mileage claims; and (4) that attorney fees are payable in connection with all of these items.

The evidence supports the WCJ's conclusion that Claimant remains disabled and that her current lower back complaints do relate to her original injury. Defendant contends that Claimant's current complaints of low back pain are unrelated to the injury at work in December 1997. Appellant makes much of the fact that Claimant did not complain of back pain on her first two visits to Dr. R. Dale Bernauer, her treating orthopaedist, following her work-related accident and his statements in his deposition that "she did not complain about it [low back pain] for approximately three months after the injury. That is late for it to show up. So, it is very hard for me to relate the two [the injury and the low back pain]." However, later in his deposition

8

the doctor did state that he thought the low back pain resulted from the neck pain. Evidently, Dr. Bernauer had not been supplied with the hospital records from the emergency room of Jennings American Legion Hospital of Claimant's January 12, 1998 visit which confirm that Claimant complained of "pain from neck to waistline." Those records also show that the emergency room physician diagnosed "back pain of unknown etiology." Additionally, the patient information sheet and the patient medical history sheets, which Claimant filled out upon her first visit with Dr. Bernauer on January 19, 1998, both describe complaints of low back pain in addition to her complaints of neck pain. We note that Claimant described her neck pain as "severe," while rating her low back pain as "moderate." In his deposition, Dr. Bernauer stated that many times a patient with multiple injuries will concentrate his or her history on the injury which is causing the most pain, and that it is not unusual for a patient not to even mention the lesser pain because they were concentrating on the greater one. The doctor went on to explain that the greater pain "blocking out" the lesser pain is called "masking." He gave the following example: "We see that a lot of times in people with multiple fractures after a wreck, . . . they come in and you find several things broken. You fix them, and then they start complaining of other things hurting. You go back and find some fractures that were overlooked." He agreed that such could be the case with Ms. Jeanise. Dr. Bernauer's own attention may have been focused on Claimant's more severe complaint of neck pain. In any event, it is clear that Claimant's complaints of low back pain started with her injury in December 1997. We find the WCJ did not err in relating her low back complaints to her on-the-job injury.

As to the extent of her disability, Dr. Bernauer stated that during the whole time he treated Ms. Jeanise, he noticed no inconsistency between her injury and her

9

complaints. He suspected that Claimant had a ruptured disc in her lower back, but, because his requests for diagnostic tests of the lower back had continuously been denied, he could not confirm this diagnosis. Dr. Bernauer examined Claimant two days before his deposition. Concerning that examination, he testified as follows:

> She is still complaining of back pain and leg - - she has back pain, neck pain, left arm pain, and bilateral leg pain. Examination done on that day showed decreased motion. She had weakness of the triceps and grip strength on the left. She, in the lower back, had decreased range of motion. She had a positive straight-leg raising and weakness of the great toe extensors and the foot extensors.

Dr. Bernauer's diagnosis was: "She has a cervical strain and what looks to be a herniated disk in her lower back. According to the E.M.G., she has got [sic] nerve irritation in her back. We never have done an M.R.I. of her back to be sure." In the doctor's opinion, Ms. Jeanise was unable to return to work.

Neither Dr. Christopher Lew, an anesthesiologist and Claimant's pain management doctor, nor Dr. Kashinath Yadalam, her psychiatrist, felt Claimant could hold down a job. Dr. Lew diagnosed Claimant's condition as "cervical and lumbar radiculopathy, occipital neuralgia, shoulder pain and depression." Dr. Yadalam, who was treating her depression, stated that the "genesis" of her psychological problems were her physical problems, and that the resolution of the former depended on the resolution of the latter. He stated that during his course of treating Claimant, she exhibited no signs of either drug abuse or malingering. Dr. Lew had been administering injections of local anesthetics and steroid which offered Claimant only temporary relief. He had to discontinue the injections when Defendant refused authorization for this treatment. The records from Lloyd T. Kelly, a Licensed Clinical Social Worker who counseled Claimant on referral from Dr. Yadalam, revealed no inconsistencies with the opinions of Claimant's treating physicians.

The report of Dr. Scott A. Gammel, an anesthesiologist who conducted an

10

Independent Medical Examination, confirmed Ms. Jeanise's symptoms of chronic lower back pain and weakness extending into her right leg. His report is somewhat favorable to the defense in that he is of the opinion that the injections Dr. Lew had been administering were "probably not warranted" based upon the short duration of relief provided.[2] Dr. Gammel stated that he felt Claimant was at maximum medical improvement, that she could not return to her former occupation (heavy labor), but could probably engage in "limited" sedentary type work. He also stated that Claimant would "likely require ongoing medical treatment with medications such as she is currently using."

Ms. Shawn Nelson, the claims adjuster for Defendant, testified that she discontinued Claimant's benefits based upon the video surveillance tape (which will be discussed more fully hereinafter), Dr. Gorin's deposition, a purportedly invalid Functional Capacity Evaluation (FCE), and the lack of objective symptoms by Claimant.

Dr. Gorin's deposition testimony, which Ms. Nelson interpreted as an attempt to defraud Defendant by attempting to "sell back" her medications to a pharmacy, is no "smoking gun." The pharmacist involved in the incident is dead; hence, he cannot shed any light on the incident. From our reading of Dr. Gorin's deposition, it appears that there was no more than a misunderstanding between Ms. Jeanise and her pharmacist as to whether she could fill some prescriptions and not others without endangering her right to continue receiving those prescriptions she really needed.

The physical therapist who administered the FCE did not characterize the FCE as invalid. Rather, he testified that: "The test was categorized as being equivocally valid." He explained the meaning of "equivocally valid" thusly: "That means that

---

[2]We note that the IME was done *after* Defendant had denied Dr. Lew's request for further myoneural injections.

11

there are certain indicators that lead one to question whether it's valid or not. Its basically an undetermined result."

As to Ms. Nelson's perception that Claimant had a lack of objective symptoms, the medical evidence adduced in this case is both objective and subjective. This is not uncommon. The medical evidence must be reviewed in its entirety to determine the direction in which it preponderates.

In sum, taking the record as a whole, we cannot say that the WCJ was clearly wrong in concluding that Claimant continues to be disabled, in ordering that her benefits be retroactively reinstated, and in ordering Defendant to supply the back brace ordered by Dr. Bernauer. While the judgment does not specifically order the defendant to approve the injections recommended by Dr. Lew, the award of a penalty for the failure to do so makes it clear that those injections should proceed.

**Defendant's Claim of Fraud**

Based mainly on the surveillance tape, Defendant alleges the Claimant's complaints are fraudulent under the provisions of La.R.S. 23:1208.

> La.R.S. 23:1208(A) provides, "It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation." Thus, in order for an employer to prove forfeiture pursuant to La.R.S. 23:1208, it must prove that a false representation was willfully made by the employee for the purpose of obtaining compensation benefits. *Resweber v. Haroil Constr. Co.*, 94-2708, 94-3138 (La.9/5/95), 660 So.2d 7. An inadvertent or inconsequential false statement will not result in the forfeiture of benefits. *Jim Walter Homes, Inc. v. Prine*, 01-116 (La.App. 1 Cir. 2/15/02), 808 So.2d 818. In addition to assessing an employee with civil penalties, a workers' compensation judge may also order restitution for any benefits or payments obtained through fraud. La.R.S. 23:1208(D). Whether an employee has forfeited her right to such benefits is a question of fact, which will not be reversed on appeal in the absence of manifest error. *Smith v. Quarles Drilling Co.*, 99-171 (La.App. 3 Cir. 6/2/99), 741 So.2d 829, *writ denied*, 99-1949 (La.10/8/99), 751 So.2d 227.

*Ashworth v. Wal-Mart Stores, Inc.*, 03-802, p. 4 (La.App. 3 Cir. 12/10/03), 861 So.2d

753, 755-56. Further, as this court recently pointed out in *Phillips v. Diocese of Lafayette*, 03-1241, p. 5 (La.App. 3 Cir. 3/24/04), 869 So.2d 313, 316-317(emphasis ours):

> In *Flintroy v. Scott Cummins Salvage*, 36,857, p. 12 (La.App. 2 Cir. 3/10/03), 839 So.2d 1231, 1238, *writ denied*, 03-1068 (La.6/6/03), 845 So.2d 1093 (citations omitted), the court explained the application of La.R.S. 23:1208 as follows:
>
> > La.R.S. 23:1208 authorizes forfeiture of benefits upon proof that (1) there is a false statement or representation; (2) it is willfully made; and (3) it is made for the purpose of obtaining or defeating any benefit or payment. The statute applies to any false statement or misrepresentation made willfully by a claimant for the purpose of obtaining benefits. All of these requirements must be present before a claimant can be penalized. *Because this statute is penal in nature, it must be strictly construed, both in its substantive ambit and in its penalty provisions.*
>
> Concerning the standard of appellate review of a forfeiture claim, the court in *Rowan Cos., Inc. v. Powell*, 02-1894, 02-1895, p. 6 (La.App. 1 Cir. 7/2/03), 858 So.2d 676, 680, *writ denied*, 03-2177 (La.11/14/03), 858 So.2d 425 (citations omitted), stated:
>
> > The determination of whether there is a false statement or representation willfully made for the purpose of obtaining any benefit or payment involves inherently factual determinations and, thus, this court's review of those findings by the WCJ is governed by the manifest error standard. Under that standard of review, this court may only reverse the WCJ's decision if we find (1) there is no reasonable factual basis for the finding in the record and (2) the finding is clearly wrong or manifestly erroneous.

A surveillance video must be viewed with a critical eye, bearing in mind that the person making the video has been hired by a party who desires to have the subject of the video depicted in the worst light. A video film can be edited. Scenes revealing the subject favorably can be deleted. The videographer can simply not record activities which would be supportive of the subject's position. For instance, in the case at hand, it is possible that the videographer witnessed Claimant using her cane while engaged in endeavors other than going to and from the offices of her doctors

13

or lawyer, but simply did not record same on the tape.

While we are mindful of the potential shortcomings of surveillance tapes, the tape at issue here does cause the court some concern. There are inconsistences between the tape and the other evidence, particularly Ms. Jeanise's own deposition testimony. There is a marked difference between the video of Claimant's labored, cane-assisted walks to and from the offices of her doctors and lawyer, and her same day, cane-free activities away from those offices.

The video of Claimant at the sites of her doctors and lawyer show her having difficulty getting in and out of her vehicle, wherein she exhibits a slow, limping gait from her car to the doors of these offices, and a conspicuous reliance on the cane. Contrarily, the tape reflects that away from these offices, Claimant ambulated quite well for relatively significant distances without the use of a cane. Also, she is seen getting in and out of various vehicles, including on and off her motorcycle, with apparent ease. The tape shows her working for a length of time on a pile of lumber, wielding a hammer, pulling nails, shifting pieces of wood, stooping, bending, and carrying a large piece of wood from the pile to her vehicle.

Her deposition was taken before she was aware that the surveillance tape had been made. In the deposition she testified that she uses the cane when "I travel and if I'm out in the yard," and that "I have to have it once I get out of the vehicle." The following deposition testimony sheds light on the situation:

Q. But since the time that you started using your cane, you've used it to get about; is that correct?

A. Pretty much; yes.

Q. Are there any times when you don't use it?

A. Yes.

Q. And when would that be?

14

A. When I'm like walking to my bathroom, because I have a hall that I can, you know, kind of –

Q. You can use your hall to brace yourself against?

A. Yes.

Later in her deposition Claimant testified that the farthest she ever walks without using the cane is "maybe from my front door to my step." A viewing of the video would indicate that this would be a distance of approximately 12 feet.

At trial, Claimant was questioned about the contrasts between the revelations of the surveillance tape and her deposition testimony. Tellingly, her explanation at one point was that at the time of her deposition, "I hadn't seen the video either."

The evidence in this case seems to contain a unique feature. At the request of the Defendant, the surveillance tape was reviewed by Doctor James Perry, an orthopaedist, who had examined Claimant at the behest of the Defendant on two occasions. After viewing the video, the doctor minced no words in opining that "the patient is guilty of fraud," stating further:

> In reviewing the video, it appears that the patient is guilty of fraud. The patient can do activities that indicate she has nothing wrong with her spine. That has been my medical opinion each time I saw the patient. I do not believe she has a chronic pain syndrome that requires her to be on medication, or that requires her to be off of work. It is quite clear that the patient can perform activities that would allow her to work. . . .

> All the various activities mentioned above indicate fraud. This patient has never exhibited any type of abnormality in regard to a medical condition. The patient has nothing to suggest that she has an abnormality caused by lifting a trenching tool. If the patient had any injury from that type of activity, it should have only lasted, at most, a few days. The patient is obviously fraudulent.

At trial, Claimant offered an explanation of why she needed to use the cane in the vicinity of the offices of her doctors and lawyer. She said that she did not take her pain medications prior to the trips to these offices for fear that it would impair her ability to drive. She also said that the drive itself caused her to become stiff and

15

affected her ability to ambulate. Granted, this testimony was given after Claimant had the opportunity to view and contemplate the video. Nevertheless, aside from the video itself, her testimony is uncontroverted on this point.

While the video is troublesome, as indicated above, it offers only a few brief, very selective glimpses of the Claimant over a very long period of time. Also, we must review and weigh all of the evidence to determine if Defendant has met its burden to prove the fraud necessary to render section 1208 applicable. This burden on Defendant is indeed difficult; *i.e.*, because the statute is penal in nature, it must be strictly construed, both in its substantive ambit and in its penalty provisions. *Chevalier v. L.H. Bossier, Inc.*, 95-2075 (La. 7/2/96), 676 So.2d 1072.

Given the onerous burden placed on Defendant to prove fraud, given that the preponderance of the medical evidence supports Claimant, and given our duty to follow the manifest error rule, we cannot find that the trial court was manifestly erroneous and clearly wrong in not finding fraud and in not imposing the harsh sanctions of section 1208.

**Penalties and Attorney Fees**

Having found that the Defendant failed in its burden of proving the fraud necessary to trigger the imposition of the provisions of section 1208, we now address the issue of whether or not penalties and attorney fees are payable under the act. In that regard, it is the claimant who has the burden of proving that the defendant was arbitrary and capricious in failing to pay the benefits owed to the claimant.

Although the workers' compensation act is to be liberally construed in regards to benefits, the act is subject to the rule that penal statutes are to be strictly construed. Louisiana Revised Statute 23:1201(I) provides in pertinent part: "Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without

16

probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims." In *Brown v. Texas-LA Cartage, Inc.*, 98-1063, pp. 8-9 (La. 12/1/98), 721 So.2d 885, 890, the supreme court stated: "Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation."

In finding that the Claimant was entitled to have her benefits restored, the WCJ also found that: "The medical reports are all over the map and are less than instructive." The court went on to focus more specifically on the conflicting medical evidence indicating that the evidence favoring the Defendant is not insignificant. In short, there is medical evidence, albeit not a preponderance, which adds reasonableness to Defendant's decision to terminate benefits.

That Defendant was wrong in terminating benefits is not in itself determinative of whether penalties and attorney fees are assessable. Penalties are not assessed automatically against the losing party. *Sarrio v. Stalling Const. Co.*, 04-34 (La.App. 5 Cir. 5/26/04), 876 So.2d 157, *writ denied*, 04-1593 (La. 10/15/04), 883 So.2d 1059.

We must also consider the surveillance tape in the context of determining if penalties and attorney fees are assessable. Though we found that the video did not provide ample evidence to support Defendant's claim of fraud under section 1208, that does not mean, ipso facto, that the video fails to extricate Defendant from the realm of being arbitrary and capricious in denying benefits. To the contrary, and as per our previous discussion regarding the videotape, said videotape does cause this court to pause over whether Claimant's complaints are entirely legitimate.

We will not join Dr. Perry in opining that the video proves Claimant to be fraudulent. However, we are of the opinion that although the doctor's analysis of the

17

tape is not controlling, it is relevant in adding credence to Defendant's interpretation of the video.

Defendant was wrong in terminating Claimant's compensation and medical benefits. However, given the legitimate conflict in the medical evidence, and the video's apparent contradictions with Claimant's testimony and portions of the medical evidence favoring her position, we cannot find that Defendant's actions terminating Claimant's basic benefits were "without consideration and regard for facts and circumstance presented." *Brown*, 721 So.2d at 890. Accordingly, we reverse the $4,000 penalty awarded for terminating Claimant's basic benefits and proportionally reduce the attorney fees by $3,000.

As to the remainder of the judgment, we affirm. Defendant argues that Claimant failed to prove that the mileage payments were untimely. It is well settled that travel expenses (mileage) incurred to seek medical treatment form part of a claimant's medical expense claim. La.R.S. 23:1201(E); La.R.S. 23:1203(D); *Milligan v. Bayou Vista Manor, Inc.*, 355 So.2d 569 (La.App. 3 Cir. 1978). Louisiana Revised Statute 23:1201(E) provides: "Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof." Once Claimant submitted a documented request for payment of mileage, as was the case here, the burden shifted to the Defendant to show that the request was timely paid. The record reflects that more than sixty days elapsed after the Claimant had made these requests for payment. Moreover, these expenses were denied by Defendant long before Defendant decided to terminate benefits.

We also find no error in the WCJ's award of a $2,000.00 penalty for Defendant's failure to provide the myoneural injections recommended by Dr. Lew. Those injections were due Claimant under the provisions of La.R.S. 23:1203(A). As

18

we stated earlier, those injections were denied even before Defendant received the report of Dr. Gammel, who was of the opinion that the injections were "probably not warranted." This denial, similar to the denial to pay travel expenses, was made by Defendant well before the decision was made to deny benefits.

Accordingly, for the reasons stated above, we reverse the award of the $4,000.00 awarded Claimant for the discontinuance of benefits, and reduce the attorney fees awarded by $3,000.00, thereby making the attorney fee award $9,000.00. All other aspects of the judgment are affirmed. All costs of this appeal are assessed against Defendant/Appellant, Tommy Cannon d/b/a/ Rental World, Inc.

**REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.**

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**04-1049**

**BRENDA JEANISE**

**VERSUS**

**TOMMY CANNON D/B/A RENTAL WORLD, INC.**

THIBODEAUX, C.J., concurring in part and dissenting in part.

I agree with Judge Amy and dissent from the majority decision regarding the reduction of attorney fees. Furthermore, the decision to reverse the award of penalties by the trial court is, in my view, erroneous.

I agree with the analysis and findings of the workers' compensation judge. Those findings were not manifestly erroneous. Moreover, the workers' compensation judge assessed a $4,000.00 penalty because "[n]one of the reasons cited by the defense for doing so [were] reasonable, appropriate, or *believable*." To reach this conclusion, the workers' compensation judge had to necessarily rely on the testimony introduced by the employer's witnesses in defense of the employer's position that its conduct was not arbitrary or capricious. It is well known that an appellate court will invariably affirm a finding of credibility except in very limited circumstances. This case should not be an exception to that rule.

For the foregoing reasons, I respectfully dissent in part.

NUMBER 04-1049

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA


BRENDA JEANISE

VERSUS

TOMMY CANNON D/B/A RENTAL WORLD, INC.


AMY, J., concurring in part, dissenting in part.

I dissent from the majority decision regarding the reduction in attorney's fees. In my opinion the attorney's fee, awarded in lump sum fashion by the trial court, is reasonable based upon the record in this case. Accordingly, I would affirm this aspect of the ruling. In all other respects, I concur.